## ROSS v. QUINNESEC IRON MINING CO.

(Circuit Court of Appeals, Sixth Circuit. October 11, 1915.)

No. 2638.

**1.** CORPORATIONS ⟨⟨⟩⟩211—SUIT BY MINORITY STOCKHOLDER—CONDITIONS PRE-CEDENT—SUFFICIENCY OF ALLEGATION.

A bill by a minority stockholder, seeking to set aside a contract made by the corporation, meets the requirement of equity rule 27 (198 Fed. xxv, 115 C. C. A. xxv) as to setting forth sufficient reason for not apply-ing to the directors or stockholders of the corporation to take the desired action, where it shows that the directors by whose votes the contract was made are in complete control of the corporation through stock ownership, and are also direct beneficiaries of the contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 814–818, 820, 821, 823, 824; Dec. Dig. ⟨⟨⟩⟩211.

Rights of minority stockholders as to management of corporate affairs, see note to Wheeler v. Abilene Nat. Bank Bldg., 89 C. C. A. 482.]

**2.** CORPORATIONS ⟨⟨⟩⟩210—STOCKHOLDER'S SUIT—PARTIES.

Where such contract was made by the corporation on behalf of sub-sidiary corporations of which it owns all the stock and takes all the profits earned, such subsidiary corporations are not necessary parties.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 808–813; Dec. Dig. ⟨⟨⟩⟩210.]

**3.** CORPORATIONS ⟨⟨⟩⟩187—CONTRACTS BETWEEN STOCKHOLDERS—CONSTRUCTION AND DURATION.

The members of a partnership organized a number of subsidiary cor-porations; the stock interest of each partner therein being in proportion to his interest in the partnership, which handled their business as selling agent, receiving stated commissions therefor. On the death of one partner the partnership was renewed, his legatees taking his place therein, and in accordance with the same agreement defendant corporation was or-ganized, its stock proportionately divided, and to it was transferred all of the stock of the subsidiary companies; the agreement providing that it should be "the absolute owner of everything hereby and in pursuance hereof conveyed to it, so that there shall be no further or other right in any of the parties, except as members" of defendant as represented in its shares of stock, and that neither of the parties should sell or dispose of any stock of defendant or interest therein during the continuance of the partnership. The agreement further provided that defendant "does and shall employ and shall operate through the said firm * * * so long as said partnership shall continue." *Held,* that, on the withdrawal of some of the members from the firm, although it continued under the same name and to some extent under the same management, the agree-ment to employ it as managing agent for defendant and its subsidiary companies, and to pay the commissions on their business, ceased to be effective or binding on the retiring members, who by their retirement lost their proportionate interest in such commissions.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 702, 703; Dec. Dig. ⟨⟨⟩⟩187.]

**4.** CORPORATIONS ⟨⟨⟩⟩316—DIRECTORS—FIDUCIARY RELATIONS TO STOCKHOLD-ERS—INDIVIDUAL BENEFIT FROM CONTRACT.

The majority directors of a corporation, which owned all of the stock of a number of subsidiary companies engaged in mining iron ore and related industries, in making a contract employing a partnership, of which they were also members, agent to manage the business and sell the products of all such companies at rates of commission aggregating

several hundred thousand dollars a year, occupied a fiduciary relation toward minority stockholders, and have the burden of proof to show that the contract was fair and reasonable and for the best interests of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1404–1406, 1408, 1409, 1412–1414; Dec. Dig. &xrarr;316.]

Appeal from the District Court of the United States for the Northern District of Ohio; William L. Day, Judge.

Suit in equity by Parthenia Burke Ross against the Quinnesec Iron Mining Company, Price McKinney, James W. Corrigan, Fred W. Steinen, James E. Ferris, Andrew Squire, and Corrigan, McKinney & Co., a partnership. Decree for defendants, and complainant appeals. Reversed.

S. H. Tolles, of Cleveland, Ohio (Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio, and Robert McCarter, of Newark, N. J., of counsel), for appellant.

Frank H. Platt, of New York City, for appellee Burke.

Thomas M. Kirby, of Cleveland, Ohio, for appellee Squire.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, for other appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. This appeal is from a final decree on pleadings and proofs, dismissing a bill filed by a minority stockholder in the Quinnesec Iron Mining Company, seeking relief against the payment by that company to the firm of Corrigan, McKinney & Co. of commissions upon sales of iron ore and pig iron produced by the Quinnesec Company's subsidiaries.

In 1894 the copartnership of Corrigan, McKinney & Co. was formed, composed of James Corrigan, Price McKinney, and Stevenson Burke, for the sale of iron ore and pig iron produced by others. The firm gradually acquired interests in various mining properties, furnaces, coal, and other mineral lands, and engaged in mining and smelting operations on its own account, largely through other corporations formed for the purpose, in all of which corporations and in all properties acquired the respective partners held interests corresponding to their interests in the partnership, viz.: Corrigan, 40 per cent.; McKinney, 30 per cent.; and Burke, 30 per cent.—the entire business being operated through the agency of the firm. Judge Burke died in 1904, leaving one-fourth of his holdings in the firm and properties mentioned to his widow, one-fourth to his granddaughter, the complainant, and one-half to his grandson, Edmund S. Burke, Jr. Thereupon (in 1905) an agreement was made, continuing the partnership under the old name (Judge Burke's interests being represented by his widow, granddaughter, and grandson), and in connection therewith the Quinnesec Iron Mining Company was formed, and to it were conveyed all the stocks in subsidiary corporations owned by the partnership (except certain qualifying shares) and all other partnership property, except that certain boats were to be held by Corrigan, and a mining property

in Mexico by McKinney, as trustees, respectively, for the Quinnesec Company; another subsidiary furnace company being formed in connection with the general arrangement. A written agreement evidencing the situation expressly declared the Quinnesec Company to be "the absolute owner of everything hereby and in pursuance hereof conveyed to it, so that there shall be no further or other right in any of the parties, except as members of the Quinnesec Iron Mining Company as represented in its shares of stock," provided that neither of the parties "shall sell or dispose of any Quinnesec stock or interest therein during the continuance of the partnership, but will leave the general business agency of said company and the conduct of all the business of said partnership as heretofore"; and the Quinnesec Company agreed that "it does and shall employ and shall operate through the agency of said firm of Corrigan, McKinney & Co. so long as said copartnership shall continue."

The Quinnesec Company thus holds the stock of 22 subsidiaries, including several mining companies, in each of several different states (the majority operating under leaseholds or royalty), four iron furnaces, one company operating ore docks in Cleveland, two terminal railways, and an electric company and two water companies (the electric company and one water company said to be public service corporations as well), and two mines in Mexico producing gold, silver and copper. A steel plant is in course of construction at Cleveland. McKinney is the president of the Quinnesec and of each of the subsidiary companies and votes the stock of the latter at annual meetings. The entire operations of the Quinnesec and of all of its subsidiaries have been and are carried on through the business agency of the partnership, of which McKinney is now the active head. The firm acts as banker for the Quinnesec; the latter, which is not operating, carrying no bank account, and the operating subsidiaries carrying only the necessary local accounts for working purposes. All cash items, both of receipts and disbursements, relating to the Quinnesec or to any of its subsidiaries, are entered in the first instance upon the partnership books, entries being carried therefrom into the Quinnesec books, and therefrom distribution made to the proper operating subsidiary. The bank account pertaining to the entire business of the Quinnesec and its subsidiaries (except the local accounts mentioned) is carried by Corrigan, McKinney & Co. The subsidiaries pay no dividends directly; their balances, whether profit or loss, being taken over by the Quinnesec. The latter has paid dividends every year until 1911. During a portion of the year the Quinnesec has a credit cash balance in the hands of Corrigan, McKinney & Co. During the portions of the year in which borrowing is necessary, loans are made on paper of subsidiary corporations indorsed by the partnership.

Sales of iron ore are made by Corrigan, McKinney & Co., as agents, and sales of pig iron by the companies by Corrigan, McKinney & Co., agents. Customers' paper is made sometimes to Corrigan, McKinney & Co., sometimes to them as agents, sometimes to the given mining company. Ever since the Quinnesec was formed, Corrigan, McKinney & Co. have received a credit of 10 cents per ton on iron ore sold and

25 cents per ton on sales of pig iron; this commission being divided among the members of the firm in proportion to their interests therein. In 1907 Burke, Jr., retired from the firm on account of some dissatisfaction on his part, and remained out for two years, retaining, however, his interest in the Quinnesec. Corrigan died in December, 1908. Thereupon the firm was reorganized; Burke, Jr., returning, Corrigan's 40 per cent. being represented by his estate, and the other holdings being the same as in 1905. Following Corrigan's death, McKinney was given salaries as president, nominally paid by each of 12 subsidiary corporations, in the amount of $5,000 each, thus totaling $60,000. Later, by consolidation of two of the companies with others, the salary was reduced to $50,000.

In May, 1911, Burke, Jr., and complainant withdrew from the firm, whereupon McKinney, Corrigan, Jr. (who was residuary legatee of his father's estate), and Mrs. Burke reorganized on June 1, 1911, under the old firm name of Corrigan, McKinney & Co. On the next day the reorganized firm was, by action of the directors of the Quinnesec at its annual meeting, appointed sales agent of the corporation and its subsidiaries for the ensuing year, but without any commissions; actual expenses alone to be paid. In 1912, however, the Quinnesec Company, by action of its directors, appointed Corrigan, McKinney & Co. its sales agent for the following year, on the scale of commissions prevailing up to 1911. Under this action of 1912, the firm drew for the year commissions amounting to $392,357.15; its expenses being $76,743.36, leaving a net profit for the year as sales agent of $315,613.79. Of these commissions $247,558.90 was for the sale of iron ore, while $144,798.25 was for selling pig iron. Included in the commissions for handling iron ore are items amounting to $102,943.02 for ore sold by certain Quinnesec subsidiary companies to others of its subsidiaries. Mr. Squires, who came upon the Quinnesec directory a few weeks after the action of June 1, 1911 (representing Burke, Jr.), was the only director voting against the allowance of commissions for 1912. The net profits of the Quinnesec for that year were about $1,900,000 after deducting the commissions referred to. Mr. Squires' motion that a dividend upon the stock be declared was not supported. The defendants Steinen and Ferris are Quinnesec directors and employés; Ferris (the Quinnesec's secretary) being, with McKinney and Corrigan, Jr., a trustee of the estate of Corrigan, Sr. So far as appears by the record, the stockholdings in the Quinnesec are the same as when that company was organized in 1905, unless as respects a few qualifying shares.

The bill (filed on behalf of all stockholders) prays that the commission contract of 1912 be declared void, and Corrigan, McKinney & Co. required to account for their profits thereunder, and that the latter and the Quinnesec Company be enjoined from renewing that contract, or making any other similar contract involving the payment of commissions to that firm as sales agent.

[1] Before considering the merits, two objections made by defendants must be disposed of. One is that plaintiff is not entitled to maintain this action, for the reason that it does not appear that she suffi-

ciently appealed to the board of directors, or to the stockholders, if necessary. The bill, however, alleges that plaintiff has not made request of the officers and directors to bring the action "because of the fact that such request would be a useless and idle performance," and that the defendants, McKinney and associates, who made the contract and benefit by it, are in the absolute control of the affairs of the Quinnesec. The record fully sustains these allegations. The requirement of general equity rule 27 (198 Fed. xxv, 115 C. C. A. xxv) in the respect referred to was thus met. Doctor v. Harrington, 196 U. S. 579, 587, 25 Sup. Ct. 355, 49 L. Ed. 606; Delaware & Hudson Co. v. Railway Co., 213 U. S. 435, 446, 29 Sup. Ct. 540, 53 L. Ed. 862; Rogers v. N. C. & St. L. R. R. Co. (C. C. A. 6) 91 Fed. at page 307 and following and page 313, 33 C. C. A. 517; Hyams v. Calumet & Hecla Min. Co. (C. C. A. 6) 221 Fed. 529, 538, —— C. C. A. ——.

[2] It is also objected, but not argued, that the court has no jurisdiction to grant the relief prayed, for the reason that the subsidiary corporations whose products are sold are not made parties; several of them being corporations of states other than Ohio and over which the court below has no visitorial power. This objection is plainly without merit. The contract in question was made by the Quinnesec Company, which owns the entire capital stock of its subsidiaries and absolutely controls them. As appears from what has already been said, payments under the agency contract ultimately and equitably come directly from the Quinnesec Company, which (as well as the members of Corrigan, McKinney & Co.) is before the court, and over these defendants the court below has complete jurisdiction to enforce such decrees as it may make. L. & N. Ry. Co. v. Western Union Tel. Co. (C. C. A. 6) 207 Fed. 1, 6, 124 C. C. A. 573, and cases there cited.

[3] Turning to the merits: Defendants urge that the agreement contained in the 1905 contract, that the Quinnesec business be carried on through the firm of Corrigan, McKinney & Co., is still effective, and that the action of the Quinnesec directors in June, 1912, appointing the reorganized firm of Corrigan, McKinney & Co. sales agent upon the commissions stated, was expressly authorized by the agreement of 1905. The contention is that, although according to the strictly legal view, and in the absence of intention otherwise, the partnership of Corrigan, McKinney & Co. existing in 1905 would have been dissolved by the withdrawal of plaintiff and Burke, Jr., in 1911, the parties in making this contract had reference to the firm as known in the trade and banking world, "regardless of the membership therein from time to time, and that they intended this firm to remain agent so long as it continued to do business under the same management or as the same continuing entity," and that the firm as reorganized in 1912 was substantially the same management and the same entity.

There are authorities which recognize a modern tendency to treat a partnership for some purposes as distinct from the individuals composing it; but we think the case here is not brought within the principle of those cases, for we think an intention that the contract should be so construed does not appear. At the time the contract of 1905 was made both Corrigan and McKinney were actively connected with

the management of the business; indeed, it is said on defendant's behalf that the services of Judge Burke had been largely of an advisory and financial nature. All the holders of stock in the Quinnesec were members of the then existing firm, and their interests in that firm were identical with their stockholding interests. It was thus immaterial to the parties concerned (and a mere matter of bookkeeping) whether a portion of the profits of the Quinnesec Company's business was first divided ratably between stockholders under the name of commissions, or whether the entire distribution was by way of dividends upon stock, except that the withdrawal of the so-called commissions had at least the effect of assuring the annual return of profits to that extent to the stockholders, instead of accumulating them by way of additions to capital. That the parties had in mind that the employment of the firm was conditional upon the identity of interest as stockholders and as partners is fairly indicated, we think, by the recital in the 1905 agreement that the interests of the parties in the several companies and properties have been kept the same as their several interests in the partnership business, by the provision against the selling or disposing of stock by either party *"during the continuance of the partnership,"* by the stated purpose of the agreement that the stock should be held "in the same proportion as their several interests in said partnership," by the further provision that "there shall be no further or other right in any of the parties *except as members of the Quinnesec Iron Mining Company as represented in its shares of stock,"* by the stated purpose that "upon dissolution of the partnership there may and shall be definite ownership to the various partners or their representatives of their proportionate interests in the properties through their holdings of the Quinnesec stock," as well as by the limitation upon the Quinnesec's obligation to employ the firm *"so long as said partnership shall continue."*

It is also to be noted that the contract relied upon did not merely provide for the payment of commissions on sales of products, but transferred to the firm the entire business management of all the corporate activities of every kind. If it be assumed stockholders have power under the Ohio statutes to permanently deprive the directors of control over the ordinary management of corporate activities, surely an intention so to do must be evidenced by language more explicit than found in the agreement in question. That the parties regarded the partnership as dissolved by the withdrawal of one or more of its members plainly appears; for example, when Burke, Jr., in 1907 gave notice that he did not wish longer to remain in the firm, Corrigan wrote that "at the end of the fiscal year, May 1, 1907, the firm of Corrigan, McKinney & Co. will be dissolved by reason of your dissatisfaction and notice"; and it appears that McKinney, at least, more or less reluctantly permitted plaintiff, (on Burke, Jr.'s, solicitation) to remain in the then reorganized firm. Moreover, in the new arrangement of 1907, Corrigan and McKinney divided between themselves the 15 per cent. interest formerly held by Burke, Jr., and the written agreement expressly provided that "the partnership is to continue *so long as it is mutually satisfactory."* So far as appears from the record, no new

contract was made on Burke, Jr.'s, return in 1909, except that he resumed his 15 per cent. interest surrendered to that extent by the Corrigan estate and McKinney. Again, when Burke, Jr., in 1911 notified McKinney of his determination to withdraw, McKinney, according to his testimony, said, "The firm will be dissolved as of to-day, June 1, 1911." Moreover, that the members of the reorganized firm regarded the agreement of 1905, with reference to the employment of Corrigan, McKinney & Co., as terminated, convincingly appears from the action of June 2, 1911, under which for the first time in the history of the Quinnesec Company any board action was taken for the employment of the firm, and this action expressly provided that the services be rendered "without commissions and other compensations other than the expense attending such services." While an attempt is made to explain this action consistently with the claimed continuation of the 1905 agreement, the explanation is not satisfactory. It thus appears that defendants are not in position to question the power and right of complainant and Burke, Jr., to withdraw from the firm in 1911; and it seems clear that their withdrawal ended whatever absolute right the original firm of Corrigan, McKinney & Co. may have had by virtue alone of the 1905 contract to act as business, financial, and selling agent of the corporations.

[4] The important question thus is whether the action of the Quinnesec directors in June, 1912 (and this was followed by like action in 1913), contracting with Corrigan, McKinney & Co. for the sale of iron ore and pig iron on the commissions stated, was a fair and reasonable transaction; that is to say, whether the payment of the commissions in question is under existing conditions a fair and reasonable corporate expense. As Corrigan, McKinney & Co. practically controlled the action of the board, and thus in effect were on both sides of the contract, the directors representing this control occupied a fiduciary relation toward the minority stockholders (Jackson v. Ludeling, 21 Wall. [88 U. S.] 616, 624, 625, 22 L. Ed. 492; Koehler v. Iron Co., 2 Black, 715, 17 L. Ed. 339; 3 Clark & Marshall on Corporations, at page 2289; Hyams v. Calumet & Hecla Min. Co. [C. C. A. 6] supra, 221 Fed. at page 537, —— C. C. A. ——, and cases there cited); and the burden is on them to show that the contract was a fair and reasonable one as respects the minority stockholders (Sage v. Culver, 147 N. Y. 241, 247, 41 N. E. 513; Harrison v. Thomas [C. C. A. 5] 112 Fed. 22, 29, 50 C. C. A. 98; Robotham v. Insurance Co., 64 N. J. Eq. 673, 710, 53 Atl. 842; Miner v. Ice Co., 93 Mich. 97, 111, 112, 53 N. W. 218, 17 L. R. A. 412; Hyams v. Calumet & Hecla Min. Co., supra, 221 Fed. at page 540, —— C. C. A. ——).

Plaintiff claims that there is no reason why the selling of iron ore and pig iron should not be done directly by the corporation instead of through sales agents. Defendants, on the other hand, insist that such agency is for the best interests of the corporation, because both of the acquaintance and standing of Corrigan, McKinney & Co. in the market as sellers and the necessity of using their credit in financing the corporations. An agreement under conditions existing in 1905 that the corporation should act through the business agency of the

firm as then constituted was not unnatural, and as circumstances then existed seems to have presented no element of unfairness. There was complete identity of interest between stockholders and partners. A liquidation of the firm's business was made unnecessary, a result doubtless desired by all interests. The Quinnesec Company was just organized and was practically unknown to the business world. Its capital, while substantial, was but a small fraction of its present holdings. Both Corrigan and McKinney were actively connected with the management and neither drew any salary. Conditions have since changed materially; the identity of stockholding and partnership interests has ceased; Corrigan, Sr., has died, and, so far as appears by the record, McKinney is the only member of the firm whose personal relations are of especial value to the partnership or to the corporation. Burke, Jr., who while a member of the firm seems to have been employed by it or by the corporation on a salary, has now apparently no connection with the business in any capacity except as stockholder. Since Corrigan's death McKinney has drawn salaries amounting to $50,000. The net corporate assets have increased from $2,750,000 in 1905 to nearly $17,000,000 in 1913 (taking no account of the value of leasehold interests), after paying in the 8 years nearly $3,800,000 in dividends. During the year in question the minority has not only paid 22½ per cent. of McKinney's salary of $50,000 (of which no complaint is made), but the same percentage of the net commissions of $315,000, assuming that the expenses of sales directly by the corporation would be no more than those of the firm. There is no reason to think that the expense of corporate sales direct would be any greater than through the medium of Corrigan, McKinney & Co., for the business of the firm and of the corporation is carried on in the one office, under the one supervision, and the bookkeeping apparently done by the same force of accountants. It would seem that the bookkeeping expense would be decreased, rather than otherwise, by a system of direct corporate sales and management, and no increase in any other direction has been suggested.

The firm of Corrigan, McKinney & Co. doubtless in 1905 had a good will of the selling business as distinguished from the corporation, and it is not improbable that this good will still exists to some extent, and apparently McKinney now represents that good will so far as it can be represented by one individual. But it is difficult to believe that the corporation, representing a combined output of about $17,000,000 per year, could not sell its products as advantageously in the name of the corporation or of the respective subsidiaries, through McKinney as its president, as in the name of the firm. It is quite likely that in 1905, and for some time thereafter, the use of the firm name and indorsement (although the firm as such has no capital) has made financial operations more easy, and to a limited extent that may still be true. But there seems no good reason for thinking that the corporation cannot now readily, through its present officers, raise upon its own credit (assuming that its financial condition is fully known) the sums necessary for the ordinary operation of its business, as well as the temporary loans needed for steel-plant construction. Its tem-

porary borrowings during the 8 years from 1905 to 1913 have ranged from $200,000 to $1,400,000 per year, or an annual average of about $628,000. On April 13, 1913, its cash balance in the hands of Corrigan, McKinney & Co. was $1,816,593.53, which is larger than its borrowings for any year up to that time.

The ultimate question is: Should the minority stockholders equitably be called upon to pay a proportionate part of the large commissions in question as consideration for such market and financial prestige as may result from the continued use of the firm name as sales and financial agent. Plaintiff is in no way estopped to raise this question, either by taking profits since 1905, by acquiescing in the 1907–1909 arrangement, or by the fact that the members of the present firm have refrained from building up an outside business or otherwise. The minority interests have seasonably protested against the 1912 action. The acts for which compensation is sought are plainly within the statutory powers of the corporation. Upon the record, we think the ultimate question above stated must be answered in the negative. Indeed, we think the action of 1911, dispensing with the payment of commissions, is itself a fairly cogent admission that their imposition would be inequitable. It is perhaps likely that the actuating reason for the withdrawal of plaintiff and Burke, Jr., from the firm in 1911 was dissatisfaction with the steel plant project, which involves an investment of from $6,000,000 to $7,000,000 (this might absorb net profits for four years or so from 1912), and their unwillingness to jeopardize their personal fortunes through liability on loans therefor. The refusal of the majority to pay dividends in 1912, and again in 1913 is said to be due to the policy of accumulating funds to meet such investment. But the fact that the majority may find it necessary, in order to carry the project through, to incur personal liability on loans for construction expense, does not, in our opinion, have any tendency to justify the payment to the majority of the commissions in question.

There is evidence that many mining companies sell through commission agents, and that the commissions under the contract in question are no more than usually paid commission brokers, and no more than paid Corrigan, McKinney & Co. before the 1905 reorganization. But that consideration is not decisive; for, while the majority has power to determine the question of internal policy whether to sell directly or through agents, the Quinnesec Company has never entered upon this policy dissociated from the management of the firm of Corrigan, McKinney & Co., and it by no means follows that the members of the latter firm would favor the policy of a separate selling agency, were they required to pay $77\frac{1}{2}$ per cent. of such expense, and thus suffer a corresponding diversion of income. The presumption is to the contrary, not only generally, but specifically, from the fact that in 1911 the firm made the sales without compensation, instead of employing an outside agent.

That Mr. McKinney's services to the business are and have been highly valuable plaintiff freely concedes, and the record compels such concession. Indeed, its success, especially since Corrigan's death, seems largely due to his personal efforts. Whatever his individual services

are actually worth, the board of directors, of course, has power to award him by way of corporate official salary, and we see no reason why, in determining such salary, the board may not take into account the period since the 1912 contract was made, provided, in its judgment, his present salary is inadequate. But the record discloses no sufficient reason for the payment to any one of commissions on sales as such, much less that the other members of the present firm of Corrigan, McKinney & Co. should receive pay for which they are not shown to render corresponding service. If for reasons sentimental or otherwise the majority in control of the corporation prefers to continue to do business through the medium of the firm, plaintiff does not object thereto. Her objection is to the diversion of income as compensation for services performable by the corporation direct. We think she is entitled to this relief.

We may add that the propositions that the firm performs large services which ordinary sales commissions do not cover, and that certain of the subsidiary corporations pay McKinney no salary, require little consideration, in view of what has already been said. The entire of the salaries paid is regarded in equity as paid by the Quinnesec. The criticism upon payment of commissions is directed to their payment at all, upon the view that the employment of commission sales agents is not shown to be reasonably necessary under existing conditions.

It follows that the decree of the District Court should be reversed, with costs, and the cause remanded to that court, with directions to enter decree in accordance with the prayer of the bill, and to take such further proceedings therein as the case may require, not inconsistent with this opinion.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes