## ALEXANDER v. THELEMAN. *

## In re ALEXANDER INDUSTRIES, Inc. No. 985.

Circuit Court of Appeals, Tenth Circuit. March 26, 1934.

William V. Hodges, of Denver, Colo. (D. Edgar Wilson and Thomas M. Burgess, both of Denver, Colo., on the brief), for appellant.

Hudson Moore, of Denver, Colo. (Wilbur F. Denious, of Denver, Colo., and Ben S. Wendelken, of Colorado Springs, Colo., on the brief), for appellee.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

McDERMOTT, Circuit Judge.

J. Don Alexander filed a claim for $118,-858.08 against the bankrupt estate of Alexander Industries, Inc.; the referee after an extended hearing, denied the claim; the trial court approved and this appeal follows.

Alexander Industries, Inc., was, to a large extent, a family corporation; the claimant himself owned 55 per cent. of the common stock at the time of the transactions in question, and his family 15 per cent. more. The Board of Directors consisted of Alexander, his wife, his son, his brother, and an employee. Alexander was the President and General Manager of the corporation, and in all the transactions in question, he acted for the corporation. The claim is the balance, as shown by the corporate books, of a long and large account between Alexander and the corporation running back to 1921. The contro-

*Rehearing denied April 30, 1934.

versy here is over an item of $135,000, which the books reflect as an indebtedness of the corporation to Alexander, and which the trustee claims is not an indebtedness.

This item came about in this way: In May and June, 1929, one Feder, exercising an option given him in April, bought 9,000 shares of the corporate stock at $15 a share, and the purchase price was paid to the corporation. The shares delivered were from a certificate of 25,000 shares belonging to Alexander which was then in New York. Alexander claims the sale made was of his own stock; that since the corporation received the purchase price, it was under an implied obligation to pay it to him, and that the credit to him on the corporate books correctly reflects that corporate obligation. The trustee contends that the sale made was of unissued stock of the corporation; that Alexander loaned the corporation his shares for prompt delivery to obviate the delay which would be incumbent upon a delivery of unissued stock incident to the legal requirement that unissued stock be first offered to existing stockholders before it is sold to an outsider. That the corporation was entitled to the proceeds; that it owes Alexander 9000 shares of stock, which it stands ready to deliver to him, but does not and never did owe him $135,000.

█ The case therefore turns on the question, Whose stock did Feder buy—Alexander's or the corporation's? Both the corporation and Alexander had stock for sale, and Alexander carried on the entire transaction. One of the vices that inhere in family corporations is thus presented: Without reflecting upon Mr. Alexander's good intentions, he so handled the transaction that he was in position to claim that it was his stock that was sold if the market went off, and his corporation's stock that was sold if the market went up. Under this state of facts, the proof must be clear indeed before Mr. Alexander may profit at the expense of corporate creditors. If the record then made leaves the question an open one, the doubt must be resolved in favor of the creditors; any other principle would permit an officer to play a game with the corporate creditors and minority stockholders where he could not lose and they could not win.

█ The question is one of fact. A finding of fact by a referee in bankruptcy, approved by the trial court, will not be disturbed on appeal if there is any substantial evidence to support it. Mullen v. First Nat. Bank of Ardmore (C. C. A. 10) 57 F.(2d) 711; In re Henry Duffy Players (C. C. A. 9) 50 F.(2d) 737; Reiss v. Reardon (C. C. A. 8) 18

F.(2d) 200; Wingert v. President, Directors & Co. of Hagerstown Bank (C. C. A. 4) 41 F.(2d) 660; In re Ross & O'Brien Iron Works (C. C. A. 2) 58 F.(2d) 961. Appellant carries an additional burden in this case, for the law subjects his dealings in matters where the corporation has an interest to a rigid scrutiny. Western Distributing Company v. Public Service Commission, 285 U. S. 119, 52 S. Ct. 283, 76 L. Ed. 655; Howland v. Corn (C. C. A. 2) 232 F. 35; Ross v. Quinnesec Iron Mining Co. (C. C. A. 6) 227 F. 337. While the sworn statement of the claim is some evidence of its correctness, and is sufficient to carry the burden over formal objection unsupported by proof, Whitney v. Dresser, 200 U. S. 532, 26 S. Ct. 316, 50 L. Ed. 584, the burden is always upon the claimant; when substantial evidence is brought forward to dispute its correctness, the question is, on the entire case including the sworn statement, Has the claim been established? In this case, on account of the fiduciary relationship of Alexander, that burden was a heavy one before the referee; it is heavier here. There is, then, but one point before us: Is there substantial evidence in the record that the corporation sold its own stock, Alexander lending it his stock to expedite the closing of the sale?

█ In our opinion there is such substantial evidence; it is quite sufficient to inject a serious doubt about the true nature of the transaction, in which event claimant should not prevail over the corporate creditors. In analyzing the proof, consideration must be given to the fact that the transaction was Alexander's handiwork; that the color he now imparts to it may well be tinted by his self-interest; and to the difficulties which confront the creditors in the matter of proof.

Both Alexander and the corporation had common stock for sale. On March 23, 1929, Alexander gave Feder, a New York dealer, an option to purchase 20,000 shares of his personal common stock; on the same day the corporation, by Alexander, gave Feder an option to purchase 50,000 shares of its unissued common stock. Two days later Alexander sent 25,000 shares of his personal stock to a member of the stock exchange, to be taken up by Feder if he exercised the option given by Alexander. Neither of these options was exercised; they do show that both Alexander and the corporation had stock for sale.

On April 24, Alexander gave Feder another option on 25,000 shares at a lower price than the March options. This option contained the sentence, "Also understand you are to provide me opportunity within reasonable

time to recover what you buy without loss to myself."

Upon receipt of this option, Feder objected to the quoted sentence. He called Alexander over the telephone about it; Alexander, his wife, son and brother (four of the five directors) were on extension phones and listened to the conversation. Feder said he could not assure him that he could get back from the company shares of stock that might be sold under the option, since he, Feder, was not in control of the corporation; that in view of the fact that Alexander and his family were in control, he could protect himself in the premises. Alexander did not give him an answer then, but later that day wired him authority to strike out the objectionable sentence.

If this option was intended to cover Alexander's own stock, the deleted sentence is inexplicable. No sane person would incorporate in an option for the purchase of a fluctuating stock a provision that the buyer would protect the seller against loss if the option was exercised. But if the option was intended to cover corporate stock, there is a reason for the sentence. Because there would be a delay in delivery of unissued shares attendant upon offering them first to existing stockholders, the loan of personal stock to fill a purchase from the corporation is entirely understandable; if that were done, and the price went up, Feder as a stockholder might well object to the corporation issuing stock to repay the loan in kind, for it is mathematically true that every share of corporate stock issued for less than its then value, dilutes the value of all outstanding stock. Consequently the sentence in the option was to secure Feder's consent to a repayment of the loan in stock. Feder did not object to it, save that he could not assure it, but suggested that Alexander could get that assurance from his family who were on the board. His family heard the suggestion, and apparently agreed, for later the telegram of deletion was sent.

But this is not all. Alexander himself, on the present trial, testified that when this option was given he was optimistic, and did not want to sell any of his own stock. The question and answer are: "It was your purpose at that time not to lessen your stock holdings? A. That is right."

Feder, the buyer, gives a clear picture of the negotiations leading up to the sale; his testimony leaves no doubt that he thought he was buying stock from the corporation. In part, he testified:

"I had business transactions with that Company. My company agreed to purchase a certain number of treasury shares of Alexander Industries, Inc. I had a further transaction with Mr. J. Don Alexander in the spring of 1929. It developed in the course of certain conversations with Mr. Alexander at that time that the Company was in need of money and I agreed to use my efforts in selling some stock to facilitate their getting this needed money. I requested Mr. Alexander to give me an option on a certain number of shares of stock that I would try to sell through the market in order to provide these funds.

"It was stated in these conversations that Mr. Alexander was to deliver his personal stock on the exercise of this option. It was understood that the proceeds from the sale of this stock was to be turned over by him to Alexander Industries, Inc.

"Mr. Alexander took the position that he wanted to be able to replace the stock which he might deliver to me upon the exercise of this call. I told him that I was in no position to make such an agreement with him as I did not control the company. After I stated that to him he nevertheless told me that I should have the option and that the funds would go to the Company. All the conversations that I can recall with reference to the replacement of stock in kind occurred prior and at the time of our securing the above referred-to option."

When the option was exercised, the proceeds were paid to the corporation. Under the personal option given in March, the proceeds were to be paid to Alexander personally. It is highly probable that a careful business man such as Feder, if he had understood he was purchasing Alexander's personal stock, would have paid him therefor, and let Alexander then lend the money to the corporation if he cared to.

By February 12, 1930, the Board of Directors had been revamped, and substantial business men displaced Mr. Alexander's family. At a meeting held that day the Executive Committee made a comprehensive report as to the condition of the corporation. That report dealt with the credit to Alexander on the books, the basis of this claim, as follows:

"The item of $108,086.69 appearing on November 30 stated as 'Due Officers' should be adjusted and removed from liabilities if possible. We were advised that this represented proceeds of sale of some personal stock which was later to be replaced from treasury stock. If this is correct and can be so arranged, then it would help offset the deficit to be created by inventory write off."

Mr. Alexander presided at the meeting at

which that report was presented; he took no exception thereto; the report was accepted and approved without dissent, and Mr. Alexander signed the minutes of the meeting.

There were later negotiations between Alexander and the corporation creditors and Feder as to how much stock he should have to replace the 9,000 shares loaned—whether the drop in market value from $15 to $2 should be taken into account in repaying the loan. This was in an effort to work out an accord, and its only bearing is for such admissions of fact by Alexander as may have been made. These were not clear-cut, and we do not rely upon them. There is enough without them.

There is much on the other side; the option exercised was given by Alexander personally and not by the corporation, while in March options were given by both. The shares sold were carved out of a certificate of Alexander's, sent on in March pursuant to a personal option then given. The proceeds of the sale made were credited to Alexander's personal account on the corporate books. Alexander paid an income tax on the profits of the sale. Alexander's verified claim and his testimony support his contention. It is not our task to marshal evidence in support of the claim; our task is ended when we have found substantial evidence to support the findings of the two courts below. There is support in the record for a finding either way, and that is the vice of the transaction; it was so handled that it could be found that Alexander sold his own or his corporation's stock; it was so left that Alexander was in the enviable situation that he could profit, at the corporation's expense, whichever way the market went. Equity cannot countenance such transactions; when they occur, doubts must be resolved in favor of the corporation and its creditors and against the fiduciary who left the matter obscure. The fiduciary has not carried the heavy burden upon him when his proof leaves his claim in the realm of speculation. It is not a question of his mental attitude; the question is, Did he so handle the transaction as to leave the proof clear that he loaned the company the proceeds of the sale of his own stock, and did not lend them stock to complete a corporate sale?

That a corporation may sometimes defend if a claim is asserted against it founded upon a fiduciary's contract with himself, does not aid Alexander in establishing this contested claim against the corporation. He did deal with his corporation; he loaned it stock or money. The question is, which? In a contest between a trustee and his cestui, the infallible and hallowed principle of law and life that "A man cannot serve two masters" is a shield of defense for the cestui, and not a sword of offense for the trustee.

Nor is Alexander in position to urge that the corporation did not take the preliminary steps contemplated by the statutes in the sale of its unissued stock. That is a circumstance bearing upon the nature of the transaction, but that is all. If the corporation did issue its stock and received the proceeds without a literal compliance with the statute, Alexander could not, on that account, appropriate such proceeds to his own use.

There being no cross-appeal, the correctness of the trial court's ruling that it was without jurisdiction to render a judgment against Alexander for the balance due the corporation after striking the $135,000 item from the account, is not before us.

The order of the trial court is

Affirmed.