### PRESIDIO MINING CO. et al. v. OVERTON et al.*

(Circuit Court of Appeals, Ninth Circuit. January 17, 1921.)

No. 3253.

1. **Courts ☜356—Case tried de novo on appeal under federal equity rules.**

While proper consideration will be given to the findings below, an equity case is triable de novo upon appeal under the new equity rules, especially where the evidence is chiefly documentary and the oral testimony of witnesses largely uncontradicted.

2. **Corporations ☜320(14)—Minority stockholders' relief confined to specific performance of contract.**

Where a stockholder and director of a mining company acquired, with his own money, adjoining ore land which he leased to the company and offered to convey to it on being reimbursed for the purchase price, his title cannot be declared fraudulent on a bill by minority stockholders, and relief will be confined to decreeing specific performance of the conveyance.

3. **Corporations ☜320(13)—Receiver not appointed for solvent mining company on complaint of minority stockholders.**

In a suit by minority stockholders, alleging that a defendant stockholder and director had fraudulently acquired adjoining ore land which he had leased to the company, evidence that no fraud had been practiced, that the company was solvent, etc., held not to authorize appointment of a receiver to liquidate the company's affairs.

4. **Corporations ☜320(11)—Evidence held to establish good faith of majority stockholder and director as to acquisition of property leased to company.**

In suit by minority stockholders, evidence that defendant majority stockholder and director had acquired adjoining ore lands which he had leased to the company and that he had publicly stated his willingness to convey such property to the company on being reimbursed for its purchase price, etc., held to establish that he had acted in good faith.

5. **Corporations ☜320(14)—In suit by minority stockholders, held that specific performance of contract by corporate director might be decreed.**

Where a director of a mining corporation acquired adjoining ore land which he leased to the company and offered to convey to it on being

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 535, 65 L. Ed. —.

reimbursed for the purchase price, a suit by minority stockholders seeking to establish a constructive trust on the property and for receivership proceedings need not be dismissed, but the court has discretionary power to decree specific performance of the conveyance, under Judicial Code, § 269 (Comp. St. § 1246), as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246), authorizing judgment after examining the entire record without regard to technical errors.

Gilbert, Circuit Judge, dissenting.

On rehearing. Former judgment (261 Fed. 933) affirmed.
See, also, 261 Fed. 1023.

R. T. Harding and Henry E. Monroe, both of San Francisco, Cal., for appellants.

William Denman and Wm. F. Rose, both of San Francisco, Cal. (Charles Clyde Spicer, of Los Angeles, Cal., and William B. Acton, of San Francisco, Cal., of counsel), for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

PER CURIAM. It should be stated that it appears that, after the filing of the amended bill and before the filing of the supplemental bill, an application was made to the court and to Judge Van Fleet for the appointment of a receiver and that after argument the court, by Judge Van Fleet, denied this motion and made an order refusing to dismiss the amended bill or to strike out parts thereof, and further that the application for the appointment of a receiver was denied without prejudice.

It also appears that after Judge Van Fleet had made this order of denial of receiver, a supplemental complaint was filed wherein the allegations of conspiracy to control the directorate of the corporation are made and thereafter trial was had on the pleadings as so amended. The receiver was not, however, appointed until the trial and until testimony had been introduced by the plaintiffs which they contended supported their allegations of conspiracy.

[1] The original opinion in this case is reported in 261 Fed. 933. That opinion is objected to by plaintiffs in this rehearing on the ground, among others, that the court treated the case as a trial de novo in this court and that the court did not give to the opinion of Judge Van Fleet that consideration it was entitled to receive under the practice in equity proceedings. The case was tried de novo in this court as required by the equity practice. In 4 Corpus Juris, 726, the rule in Equitable Proceedings is stated as follows:

"Under the old chancery practice and usually under the Codes of Procedure, suits in equity are tried de novo on appeal upon the entire record and evidence. The appellate court itself will sift the whole question and determine what the findings of the trial court should have been upon such evidence as was competent and proper. The court below and the appellate court are judges of both law and fact."

See New Equity Rule 46, to which Hopkins in his new Federal Equity Rules adds this note:

"By empowering the trial court to pass upon the admissibility of the evidence and providing for the appellate review of questions of evidence, the

rule restores the practice as it existed prior to 1842 as explained in Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521."

In American Rotary Valve Co. v. Moorehead, 226 Fed. 202, 141 C. C. A. 129, in the Circuit Court of Appeals for the Seventh Circuit upon a petition for rehearing the appellant claimed that the court in affirming a decree of the District Court without filing a written opinion had either expressly or impliedly held that, under the new equity rules, the decree of the trial court upon a disputed question of fact was binding upon the appellate court. In answer to this objection, the court said:

"We had no intention of being so understood. Under the new equity rules, as well as under the old ones, the reviewing court has the right, and owes to itself and to the parties, the duty, of trying the question of fact de novo. Under the old rules, the findings of the trial court were entitled to be treated as very persuasive, and such findings were not to be disturbed, unless it appeared quite clearly that the trial court had either misapprehended the evidence or had gone against the clear weight thereof. We conceive that the new rules have made no change in those respects. Cases now are ordinarily to be heard by the trial judge in open court, while formerly they were ordinarily referred to a master. But under either set of rules, if the witnesses have been heard in open court, one element that rightly enters into the reviewing court's consideration of the evidence de novo is the opportunity of the trial judge to estimate the credibility of the witnesses by their appearance and demeanor on the stand. Espenschied v. Baum, 115 Fed. 793, 53 C. C. A. 368."

Also Westermann v. Dispatch Printing Co., 233 Fed. 609, 147 C. C. A. 417, where, in an equity case on appeal, Judge Denison for the Court of Appeals of the Sixth Circuit said:

"It follows that we must decide the questions of fact as well as * * * of law, * * * save that, under familiar rules, the conclusion of the trial court on questions of fact will not be lightly disturbed."

This is the established rule of this circuit. We believe this to be a correct statement of the equity rule. Where evidence is conflicting and the trial judge has had the opportunity of seeing the witnesses, observing their demeanor, while testifying, judge of their candor and intelligence, and thus be able to determine their credibility and the weight to be given to their testimony, the finding of the trial court is persuasive and presumptively correct, but not conclusive. U. S. v. Grass Creek Oil & Gas Co., 236 Fed. 481–484, 149 C. C. A. 533.

In the present case, the opinion of this court and its findings of fact were based upon the pleadings, letters, documents, exhibits, transcripts from books of accounts, the report of a public accountant appointed by the District Court, and the uncontradicted testimony of witnesses—all in the record. This character of the evidence made it the duty of this court to examine the record and find the material facts for itself.

We are not here dealing with any serious or material conflict of testimony obtained from witnesses who appeared and testified in open court and where the court was called upon to determine the credibility of witnesses from their appearance or demeanor on the stand, but we are dealing with testimony, much of it uncontradicted and with the proper construction of a variety of written documents

and accounts and their relation to each other in certain business transactions extending over a period of years. That this may appear fully and distinctly, we again refer to the facts as they appear in the record.

[2-4] The Presidio Mining Company had owned and worked section 8 under the superintendency of the defendant Noyes since 1883. It was a silver-producing mine, and in 1907 the high grade ore had been practically exhausted and Noyes recommended to the board of directors of the company the installation of a cyanide plant for the more efficient and economical working of the ores. The stock of the company was divided into 150,000 shares of the value of $1 each. The installation of such a plant would require the levy of an assessment of at least 10 cents per share on the stock. The question of levying such an assessment was submitted to the stockholders for their action.

Objection was made by stockholders, coming mainly from General Anson Mills, living in the East, owning 17,000 shares and the predecessor in interest of the plaintiffs in this suit. This objection is contained in a letter to John F. Boyd, the president of the company, dated April 26, 1907, and states the objection as follows:

"My dear Boyd: Yours of March 1st, with inclosure, was duly received, and I beg your pardon for the gross neglect I have given you, especially as you have always been so kind and upright with me in our dealings with the Presidio business. I have now your second letter of the 18th instant. I had no adequate excuse for my neglect, but will explain that when your first letter was received the slump in the stocks of railways and industrials was in progress and as Mrs. Orndorff, who lives with me, and I have a great deal invested in that line we did not feel like taking any action until we saw how that matter was coming out, which is still in agitation. Then comes the great political excitement, which will probably keep the financial matters in a turmoil for the next year; then comes the silver slump, so we did not feel like joining you in the cyanide proposition and do not yet.

"Of course you know more about such matters than I do, but it seems that it would be rather risky to put $70,000 in the business as it stands now, I suggest that it would be better to shut down for at least a year; discharging all employees save two or three inexpensive men to watch the property; sell off all the transportation property and other property that is expensive to maintain and await for future developments. If the country settles down to the business basis of a year ago and silver rises to, say, 60 cents, I think we might start the cyanide process up at the mine, as you suggest in your last letter, saving the expensive transportation.

"Thanking you for your kindness and regretting that I had neglected you so long, I am,

"Very truly yours,                    Anson Mills."

In response to this objection of Mills, the board of directors directed the closing down of the mine and milling property of the company and the discharge of all the employees. At that time John F. Boyd, the president of the company, owned 36,966⅔ shares of the stock of the company in his own name and 20,265⅔ shares as trustee for his wife, Louise A. Boyd, making a total of 57,232⅓ shares. Boyd immediately resigned the presidency of the company, and he and his wife transferred their stock to one Osborn, who had been the secretary of the company since 1887; but with the direction to Osborn that Noyes should have one half of the stock if he so de-

sired. Noyes accepted the stock but requested that it remain in the books of the company in the name of Osborn. Boyd's proposal to transfer half of his stock to Noyes was because Noyes had been the superintendent of the mine since its organization in 1883, and had made it highly profitable for the stockholders during his superintendency. Osborn thereupon became the trustee of one-half of the Boyd stock for the defendant Noyes; but the stock was not transferred on the books of the company until December 13, 1912.

On September 16, 1907, Mills wrote to Boyd as follows:

"My Dear Boyd: I have again neglected you very kind letter regarding the Presidio Mine, partly because I have been moving around, but principally because at the time I received it the great disturbance in the financial world was going on and is still in progress, affecting me as I suppose it affects you—railroad stocks and bonds, and there is no telling when it is going to end; so I take it for granted that you would not be willing to put in the new process under existing circumstances.

"I am going down to Presidio del Norte some time soon, probably next December, and will visit the mine and learn all I can about it, as of course I want to save it if it is possible, and whatever I can of the investment I have in it. Mrs. Orndorff is living with us at present and she agrees with me that it would be inadvisable to make the investment under the present circumstances.

"Yours very truly,                          Anson Mills."

On June 2, 1908, Mills wrote to Boyd as follows:

"My Dear Boyd: I have two of your letters, unanswered, and must explain that I was confined to my bed most of the time after January first with grip and other afflictions, but I am now well again and want to thank you for the interest you have always taken in the Presidio mine.

"I have lost my confidence in it, however, and hardly expect to receive anything further, but I want to ask you this question: Am I in any way personally responsible for future assessments should it run into debt?

"I know that the last few years has been very hard on you financially owing to the destruction of the city, but we have all been restricted financially owing to the hard times, which seems to be improving now.

"Yours very truly,                          Anson Mills."

The average price of silver per ounce at this time was 53 cents. It is evident Gen. Mills wished to avoid further responsibility for the mining operations of the company.

In reply to this letter Boyd appears to have written to Mills that he had disposed of his (Boyd's) stock to Osborn, and in answer to Mills' inquiry as to his liability as a stockholder, he wrote (as appears from a pencil note on the Mills letter) as follows:

"As a stockholder of the Presidio mine you are responsible in the proportion that the stock held by you bears to the capital stock for all debts and obligations incurred by it while you are such a stockholder."

In reply to this letter, Mills wrote Osborn under date of June 18, 1908, as follows, from Washington:

"My Dear Mr. Osborn: Mr. Boyd has informed me that he has disposed of his holdings in the Presidio mine to you and has retired from the presidency.

"Under the circumstances, I feel disposed to dispose of my interests. Are you willing to make me an offer? If so, please do so. You are aware of the extent of my holdings.

"Perhaps Mrs. Orndorff would be willing to consider an offer for her holdings, also.

"Yours very truly, Anson Mills."

On September 7, 1908, Mills wrote to Osborn as follows:

"Dear Sir: Inclosed please find my certificate for 15,000 shares in the Presidio Mining Company with transfer indorsed on the back thereof as follows: Ten thousand shares to Winfield S. Overton, No. 2 Dupont Circle, Washington, D. C. Twenty-five hundred shares to Carl A. Martin (Capt. & Quartermaster Fort Leavenworth, Kansas). Twenty-five hundred shares to Kathleen C. Kline, the Crown Hotel, Providence, Rhode Island.

"Please make out new certificates and forward to the addresses above designated.

"Yours very truly, Anson Mills."

On December 22, 1908, Mills wrote to Osborn as follows:

"My Dear Mr. Osborn: I inclose you herewith two certificates Nos. 7 and 8, representing 1,000 shares in the Presidio Mining Co., which I desire transferred to Winfield S. Overton, 2 Dupont Circle, Washington, D. C., and have made proper endorsement on the back of said certificates.

"Please make the transfer and send the new certificates to Capt. Overton at above address.

"Yours very truly, Anson Mills."

Capt. Overton is a son-in-law of Gen. Mills.

After Capt. Overton became a stockholder in the Presidio Mining Company in September, 1908, he received from Mr. Noyes, the manager of the company, the annual reports to the stockholders in which the operations of the company during the preceding year were set forth. It does not appear, however, that Capt. Overton took any notice of these reports or made any inquiry concerning the operations of the company or the workings of the mine, until March, 1915, when with his wife he came to San Francisco to visit the Panama-Pacific International Exposition. In his testimony upon the trial he said he then came in contact with the officers of the company. He first saw Mr. Osborn, the secretary of the company, in the office of the Presidio Mining Company. Mr. Osborn offered to take him to see Mr. Noyes. Capt. Overton said he wanted to know something about the affairs of the company just in a general way. His wife was present with him at that time. Mr. Osborn took them to see Mr. Wm. S. Noyes at his office in the Mills Building, and they had rather a general and pleasant conversation with him. Capt. Overton asked Mr. Noyes and Mr. Osborn generally about the affairs of the company; what the prospects were for getting any money out of it. Osborn said he had been offered quite a good price for the stock but had not sold it.

Section 5 had been mentioned by Mr. Noyes in his annual reports and the possibility that the Presidio Mining Company might purchase it at the price he paid for it. Capt. Overton made inquiry concerning it. Mr. Noyes said he bought it for sentimental reasons but was very sorry he bought it, that, a widow (Mrs. India Scott Willis), an old friend of his, owned considerable stock (in the Presidio Mining Company), and that he bought section 5 in order to enable her to get some dividend out of it, but that she had died

since and he was now sorry that he bought it because he had no interest in that respect and he wished he had his money back.

Capt. Overton inquired about the meaning of "one-half" (referring to the lease of section 5 to the Presidio Mining Company dated November 19, 1913); he said that, being a farmer, he divided the net after all expenses had been deducted, and he asked Mr. Noyes if that was the case in this instance and Noyes told him that it was. Capt. Overton asked Noyes if an actual account was kept by the mine of the cost of mining and milling and if the "cream" was divided, and he said it was. Overton asked Noyes for a letter to the mine, where he was going on his way East, and Noyes gave him one to Mr. Gleim, the superintendent, requesting him to show Capt. Overton the mine. Capt. Overton went to the mine on his way East; that was in April, 1915. Gleim met Capt. Overton and his wife at Marfa with an automobile and took them to the mine at Shafter, where they remained over night at Gleim's home. Gleim took them through the mine and showed them the plant. Capt. Overton expressed to Gleim a great surprise at seeing such a splendid equipment because the mine seemed to be a going concern and not a dead one.

In the evening Capt. Overton asked Mr. Gleim to show him the records where the expenses of mining and milling from section 5 were kept. Mr. Gleim said no such record was kept there. Capt. Overton said, "Then Mr. Noyes has told me a falsehood." Mr. Gleim said he could not help it there was no such record kept there. Capt. Overton inquired whether it was possible to arrive at what half of the net was without keeping the expenses there, and he said it was not. Mr. Gleim said Noyes did not even want a detailed statement from him, and to illustrate he showed Capt. Overton a blueprint where Noyes had written across in red ink: "I think this is getting too d——d fine." Gleim pointed that out as showing that Noyes did not want details. It was a blueprint where they put down the assays and things of that kind. Mr. Gleim said Noyes wanted him to figure everything under two heads, "general expense and mining expense—mining and milling."

It appears that Mr. Noyes and Capt. Overton did not understand each other as to how or where the detailed reports were kept, whether at the mine or in the office in San Francisco, or whether section 5 and section 8 were being worked as one mine or separately. Capt. Overton told Gleim that "Noyes had lied and was a liar." Upon the trial Capt. Overton was asked on cross-examination:

"Do you mean to say that Mr. Gleim did not in detail explain to you that one-half of the net was arrived at by stope assays, and by keeping the tonnage separate from the two mines, and didn't he tell you that he kept accurate stope assays of section 5 and accurate stope assays of section 8 and that he kept an accurate account of every ton of ore that came out of section 5 and that he kept an accurate account of every ton of ore that came out of section 8?"

Capt. Overton answered: "I do not know." But Capt. Overton insisted that Gleim told him "that" he (Gleim) "knew nothing of how one-half of the net was arrived at, * * * that he worked

section 5 and section 8 * * * as one mine and absolutely knew nothing about the details at all—they treated them as one mine." This testimony of Capt. Overton with respect to this matter is flatly contradicted by Mr. Gleim and by the reports themselves.

This controversy resulted in Capt. Overton refusing to ask any further explanation from Mr. Noyes concerning the operations of the company and undoubtedly became one of the contributory causes of this suit.

Mr. Gleim showed Capt. Overton the annual report of the stockholders, which Overton had not then seen, but he found his copy when he arrived home in Washington. Capt. Overton went over this annual report with Gleim. He testified that he saw in this report that Noyes claimed that the company owed him a very large sum for the operation of section 5 for his half of the net. He went over the report mathematically with Mr. Gleim and said to Gleim: "If those figures be true section 8, our section, must have been run at a tremenduous loss. Has it done so?" Mr. Gleim said: "No, it has not done so." Overton said: "Well, if Noyes made so much and the mine made nothing the difference must have been a loss. You must have mined and milled every ton of ore at a loss." Mr. Gleim said: "That was not so." Capt. Overton testified:

"I then said, 'These figures reduce this report—using a Latin expression reductio ad absurdum,' and he said, 'Yes.' It was Mr. Noyes' report that we were referring to. I stayed there overnight and I told Mr. Gleim that I was going to make an investigation; that things could not be right and there had been too many falsehoods told me."

What was there in this discovery tending to show that the mine was being operated at a loss? The report referred to was the annual report of Mr. Noyes as vice president and manager for the period of 16 months ending December 31, 1914. Referring to that report we find that the "very large sum" which Noyes claimed they owed him was $42,822.40. Turning to the preceding page of that report we find the following:

Mr. Gleim's report shows an operating profit of $67,014.10 (for the sixteen months ending December 31, 1914); the disbursements at San Francisco (comprising administration expenses, taxes, insurance, interest and exchange, and legal expenses) of $20,959.04 leaves a final net for the year of $46,055.06. To this net was added the increase in bills payable during the year $21,753.39, making a total of $67,808.45 to account for. Out of this total the following capital expenditures were made:

| | | |
|---|---:|---:|
| Mill (additions to) | | $10,929.19 |
| Tramway | | 24,752.32 |
| Surface tracks | | 4,346.22 |
| Total additions to plant | | $40,027.73 |
| Ore purchased | $15,689.90 | |
| Supplies (additions to) | 3,714.56 | 19,404.46 |
| Total payments | | $59,432.19 |
| Increase in cash on hand | | 8,376.26 |
| | | $67,808.45 |

Turning to the report of Klink, Bean & Co., the court's official accountants, we find that they reported that the operative profit on ore taken from section 5 from January 1, 1913, to December 31, 1915, was:

| | |
|---|---|
| 1913 | $ 78,837.82 |
| 1914 | 72,389.72 |
| 1915 | 75,004.18 |
| Total | $226,231.72 |

But Capt. Overton's complaint was that while Mr. Noyes had $42,-822.40 due him on December 31, 1914, the mine had made nothing; that this could not be right and he was going to make an investigation. What is the answer to this criticism of Mr. Noyes' report? It is this: The company had put in some absolutely necessary improvements for the economical operation of the milling property, viz., the cyanide plant, a tramway, and track, improvements which were of course an expense of the company to be paid for by the company out of its share of the profits.

When on the trial the defendants were proceeding to prove the cost of these improvements by the testimony of Mr. Noyes, the plaintiffs' counsel, having examined the books of the company, offered to stipulate that there was paid for the cyanide plant $35,000, approximately $20,000 for the tramway, and $24,000 for the track improvements—all on the property—totaling $79,000. The actual amount, as appears from the books, was $79,359.03. On December 31, 1914, the company had these improvements on its property as its share of the profits and Mr. Noyes had then due him $42,822.40 as his share of the profits.

After leaving Shafter and the mine, Capt. Overton went home to his farm in Maryland, where he studied the annual report more closely, the one he found there on his arrival or shortly after. He then wrote to members of his family who had large sums involved and proposed to raise a fund for investigation. Capt. Overton returned to San Francisco, arriving here on July 6th, to start an investigation. He testified that he went to the office of the company with a Mr. Glidden and found Osborn there. He told Osborn that he believed he had been deceived by the reports about the low price of silver and the low grade of ore and that he was going to find out. He asked to look at the books. Prior to this time he knew nothing as to the cost of the operation or the cost of conducting the business of the Presidio Mining Company except in a general way. He first asked about the salaries of the officers. He understood that Noyes was getting $450 a month. He knew nothing else. He knew that Osborn was the secretary and Wm. S. Noyes was the vice president and general manager because that was in the annual reports. He did not know that B. S. Noyes was an officer, director, or president or anything else. That did not appear in the annual report. In the course of the investigation, the first thing Overton went after was these large salaries. In the course of the examination Glidden had the minute book. He called to Overton and said, "Well, here is where the graft is," and they found the $45,000 bonus resolution.

When Capt. Overton saw the bonus resolution of $45,000, he told Osborn that $3,000 of that was his (Overton's) money and he wanted to know what it was done for; what these extraordinary services were, and he said: "Well, he got the lease for the Silver Hill Mill & Mining Company." Overton asked why he had never known about it; why the stockholders had never been informed, and Osborn said: "There are the books. You could have known it." Capt. Overton stated that this was on November 19th (evidently referring to the lease of that date), and he said to Osborn:

"Mr. Noyes got $45,000 for getting this contract and he promised to see it extended and investigated, and instead of that at the end of ten months he canceled it himself."

The "bonus resolution" is a misnomer. It did not provide for the payment of money as additional compensation or as compensation at all, but for ore delivered by Noyes from section 5 to the Presidio Mining Company. This fact was set forth in the defendants' answer and clearly established by the evidence. The answer is as follows:

"This defendant avers that said resolution of February 15, 1913, was not intended to authorize or provide for the payment of any bonus to this defendant, but was intended to confer upon the officers of said Presidio Mining Company authority to settle with him for ore delivered to the said Presidio Mining Company from said section 5 in accordance with said previous agreement or understanding, namely, that the said Presidio Mining Company should account to the said Wm. S. Noyes for the one-half of the net profits of all ores derived from said section 5, and that the partial payments in said resolution provided for were designed to equal, as nearly as possible, the estimated one-half of the said net profits, and they did so equal, approximately, one-half of the said net profits. That said resolution was further intended only as a temporary expedient until this defendant could acquire the legal title to said section 5, and be in a position to legally contract as a lessor."

Overton told Osborn that he was going to make a thorough investigation and push this thing to the limit, and Osborn replied:

"We have got more money than you have got, and if you do this we will ruin you and make a beggar out of you."

Overton told Osborn that threats never scared him and he was going ahead. He did go ahead with his examination of the books of the company, and on July 26, 1915, as a result of such examination, he verified the original bill of complaint filed in this action. The bill of complaint contained recitals from the proceedings of the Presidio Mining Company as set forth in the minutes of the board of directors of the corporation, a copy of the lease of January 25, 1913, attached to the bill of complaint, wherein the Silver Hill Mill & Mining Company leased to the Presidio Mining Company, upon specific conditions, section 5 for the term of one year, but containing the express provision that the lease should terminate on 30 days' notice given in writing from either party to the other party to the contract; and also in the body of the complaint there was set forth the resolution of February 15, 1913, wherein the corporation agreed to pay to Wm. S. Noyes for valuable services rendered the corporation the sum of $45,000 to be paid in installments at times specified, provided the earnings of the company should be sufficient to make the payments at such times; and if the earnings were not sufficient then as

fast as the earnings of the company would permit. There was also attached to the bill of complaint a copy of the lease dated November 19, 1913, wherein Wm. S. Noyes, who in the meantime had become the owner of section 5, leased to the Presidio Mining Company for the term of one year, that section upon certain specified conditions, provided that the lease, like the one of January 29, 1913, should terminate on 30 days' notice given in writing from either party to the other party to the contract.

As said in our previous opinion:

"It was the mixing of the ores from section 5 with the ores from section 8 that made the mining and milling operations of the Presidio Mining Company profitable. Without such ores the operations of the company would have been unprofitable. The latter had a mill, but no ore in section 8 of sufficient value to make the working of the plant under the pan-amalgamation process profitable. Noyes had ore in section 5 of sufficient value, but he had no mill to reduce the ore, and the evidence was that the building of an independent mill for section 5 alone was not justified by the amount of ore in sight. * * * What, then, could be more practicable and profitable than to bring these two properties together, by an arrangement or agreement such, as we find in the lease of November 19, 1913, wherein it was agreed that the Presidio Mining Company would pay Noyes one-half of the net value of all the ores taken from section 5? The advisability of bringing these two properties together is admitted by the plaintiffs and is made the basis of this suit." 261 Fed. 945.

The company was solvent at the time this action was commenced, and at all times since January, 1913, it has been solvent and a going concern. Capt. Overton in April, 1915, expressed his great surprise to Mr. Gleim at seeing such a splendid equipment because the mine seemed to be a "going concern and not a dead one." It is nowhere charged that Wm. S. Noyes was insolvent or that he was not able to respond in damages.

The defendants moved the court (Judge Dooling) to dismiss the bill of complaint on the ground that it did not state facts sufficient to constitute a cause of action. Judge Dooling granted the motion on the grounds that—

1. The bill did not show that section 5 was bought with the money of the Presidio Mining Company.

2. It did not show that the lease of November 19, 1913, was not profitable to the Presidio Mining Company.

3. It did not show that Wm. S. Noyes was not the owner of section 5.

4. It did not show any legal or equitable interest of the Presidio Mining Company in section 5.

If the complaint did not show that the company had any legal or equitable interest in section 5, it did not show any grounds for the assertion of either a resulting or a constructive trust.

The plaintiffs were given 20 days within which to file an amended bill of complaint stating a cause for the granting of equitable relief.

On September 25, 1915, plaintiffs filed their amended bill of complaint, verified as before by Capt. Overton, in which matters set forth in the original bill of complaint were restated with some amplification and with the copies of the original exhibits attached to the complaint.

The case set forth in the amended bill of complaint, like the case stated in the original bill of complaint, was based upon recitals contained in the minutes of the board of directors of the corporation, upon the lease of January 25, 1913, the resolution of the board of directors of February 15, 1913, and the lease of November 19, 1913.

Three days after the filing of the original bill of complaint, to wit, on July 29, 1915, Capt. Overton sent to Mr. Gleim in Texas the following letter:

"The Montclair, 995 Pine St., San Francisco, Cal., July 29, 1915.

"Dear Mr. Gleim: Well, you see I have struck and struck hard. I shall pursue these men to the end of the trail and shall live here the rest of my life if necessary.

"I have telegraphed Mr. Stevens to ask the El Paso papers to say that I hold you in highest esteem—you are the only clean official in my opinion.

"In going over the books I learn we pay some one $46 a month regularly from the S. F. office to spy on you. I asked Osborn who the spy was but he said 'I don't know. Only Mr. Noyes knows who he is.' So be discreet.

"You will never have them over you again. I expect I shall have quite a little to do with it hereafter and with honest men in the mine will be a success. Bonuses will go in dividends.

"I have told the S. F. reporters that I have only one thing to say beyond what they see in the complaint and that is, Mr. E. M. Gleim is an honorable and efficient official and is excluded in my complaint of the management.

"I think better days are in store for you. Mrs. Overton liked you and your wife too. I have not written because I did not want these people here to jump on you as assisting me—which you did not.

"I am glad I like you. I so hate those 'bonus' men up here it is a relief to recall a clean efficient official. Of course, Noyes would insist on this too for he needed all the graft.

"If I ever control the management here I pledge you my word I shall put no spy on you; I wouldn't insult a man so.

"Please regard this note only as confidential. You can show the rest all you please. It is in the press now.

"Anything you may say to me will be considered confidential but with your spy there it is best not to write me.

"Hastily               [Signed] W. S. Overton."

The defendants contend that this letter discloses the fact that the real purpose of this suit and the only purpose was to enable Capt. Overton to secure control and management of the company in his own hands and not to serve the interests of the minority or other stockholders in the corporation. In support of this contention the defendants point to the silence of the minority stockholders in this action—they have not asked to be made parties to it—the extraordinary character of the charges of conspiracy and fraud contained in the original and amended bills, and the prayers for relief attached to each. The temporary injunction issued against Noyes restraining him from receiving any money from the company on account of section 5 and against transferring any title thereto; the amended prayer to the amended bill demanding the removal of all the directors and officers of the company; a sweeping injunction against all their acts as officers of the company; the appointment of a receiver to take charge of all the affairs and business of the company, authorizing him to sell the entire property and assets of the Presidio Mining Company, wind up the affairs of the corporation, including section 5, prohibiting Wm. S. Noyes and the other defendants from in any way par-

ticipating in said sale directly or indirectly or from having anything further to do with said section 8 or section 5 or with the affairs of the corporation.

This prayer for relief and Capt. Overton's letter to Gleim dated July 29, 1915, appear to have the same object in view, namely, to oust Wm. S. Noyes and his codefendants from the corporation and deprive them from any further connection with it or interest in its affairs.

The District Court in an oral opinion found that the main matter for consideration in the case was the acquisition of section 5 in the name of Wm. S. Noyes; and he finds that the property was in fact acquired by the funds of the company in this way:

"That while he manipulated the securing of the control of that section and its eventual transfer to his name by means which might upon their face bear the impress of having been procured by funds other than those of the company, nevertheless he knew at the time that he had potential control of this company and that he could procure the means or funds from the company with which to pay for this land; and that he pursued a course which brought that result about."

That is to say, the money for the purchase of section 5 was paid by the Presidio Mining Company but the title was taken in the name of Wm. S. Noyes, thereby raising a resulting trust in favor of the Presidio Mining Company, but notwithstanding this finding, in its oral opinion, the District Court directed a decree to be entered finding among other things that Wm. S. Noyes was a trustee of said section 5 for and holding the title for the benefit of the Presidio Mining Company, subject however to the payment of its purchase price of $24,009.33, together with taxes and assessments paid by said Wm. S. Noyes on section 5 and other moneys properly paid by him on account of that section. It was further provided that he be allowed interest on all of said sums from the date of payments made by him at the rate of 7 per cent. per annum. It was also provided that in and by a final decree to be entered in the case, the said Wm. S. Noyes should be ordered and directed within 30 days from the date thereof to transfer said section 5 to said Presidio Mining Company by proper deed free and clear of all liens and incumbrances; that said Wm. S. Noyes be credited with the purchase price of section 5, together with interest thereon at the rate of 7 per cent. per annum from January 25, 1913, and also any sums which might be found to have been paid by said Wm. S. Noyes, for the use and benefit of said Presidio Mining Company, together with interest on said sums at the rate of 7 per cent. per annum from the date of application.

The plaintiffs claim that this decree raises a constructive trust wherein Wm. S. Noyes, while holding a fiduciary relation to the Presidio Mining Company, acquired the title to section 5, but this is not sufficient to entitle the plaintiffs to a decree which carries with it the judicial declaration of a fraudulent acquisition of the title by Noyes and that he has refused and still refuses to convey the title to section 5 to the Presidio Mining Company upon the payment of the purchase price. Noyes admits that he purchased the title to section

5 for the Presidio Mining Company. It has been judicially determined that he did so with his own money as the decree recites, and the record shows that he has been ready and willing at all times since said purchase to convey the title to the Presidio Mining Company upon being paid the purchase price. He does not refuse to convey. He does not hold the title fraudulently. His willingness to convey upon the payment of the purchase price deprives equity of its jurisdiction to declare Noyes' relation to the title fraudulent. What then remains for equity? It may decree specific performance, a remedy within the discretion of the court. Willard v. Tayloe, 8 Wall. 557–565, 19 L. Ed. 501; 25 Ruling Case Law, par. 16, and cases there cited.

There is an order in the decree appointing a receiver to take possession of all the property of the corporation including section 5 and operate the same in all its departments and ramifications as a mining and milling property. The corporation was not insolvent nor in any danger of insolvency, but was a going concern in a high state of efficiency as shown by defendants' objections to the appointment of a receiver, and the accompanying statement filed January 28, 1918, summarized as follows:

The total liquid assets of the Presidio Mining Company, consisting of bullion and supplies, were in 1913 invoiced at $38,203.28, but for which the company realized $25,884.

On August 28, 1916, three years after the new plant had commenced operations (with the exception of the tramway) the company had on hand the following:

1. The cyanide plant all paid for.............................$ 79,359.03
2. Mining supplies at Shafter................................. 30,627.78
3. Bullion in transit........................................ 3,600.00
4. Bullion at the Selby Refinery............................. 11,167.75
5. Cash in San Francisco..................................... 7,741.97
6. Cash at Shafter.......................................... 32,438.94

    Total ................................................$164,935.47

And all this was accomplished by Noyes upon his own credit, without the levying of a single assessment upon the stockholders.

In the five years of the defendants' administration of the property as directors of the corporation, the assets of the complainants had increased in value to the sum of $349,285.27 as of the date of January, 24, 1918, consisting of the following items:

Cash and bullion in San Francisco.............................$ 63,912.03
Liberty bonds ............................................ 25,000.00
Cash in Savings Bank, Marfa, Tex. .......................... 15,000.00
Cash in Marfa National Bank, Marfa, Tex. ..................... 43,154.46
Mining supplies at Shafter, Tex. ............................ 45,183.50
Permanent equipment since Jan. 1, 1913....................... 157,036.28

    Total....................................................$349,286.27
Deduct from this amount the sum due Wm. S. Noyes for his one-
    half of the net proceeds under the terms of the lease of Novem-
    ber 19, 1913, estimated as of the date above at................ 110,000.00

                                                          $239,286.27

270 F.—26

The complainants' only answer to the first mentioned statement is the assertion that all the alleged assets mentioned in the defendants' objections were on hand because of the injunction granted in the suit and the vigilance of the complainants in guarding the company's welfare. This statement is unsupported by any evidence in the record. The injunction pendente lite was issued December 12, 1916, after the property had been operating under the management of Wm. S. Noyes for nearly four years under the leases of January 25, 1913, and November 19, 1913. During this time at least four-fifths of the assets of the company were accumulated; but assuming that this answer is in some degree true, it was not alleged that the injunction was to be dissolved or that the alleged vigilance of the complainants in guarding the company's welfare was to be withdrawn. On the contrary, the objection to the appointment of a receiver was based upon the assumption that the injunction was to be continued and that section 5 would finally be adjudged to be the property of the Presidio Mining Company with a decree for its conveyance to the company. On that assumption defendants urged as a ground for their opposition to the appointment of a receiver that—

"Defendants further state that on the assumption that section 5 will finally be adjudged to be the property of the Presidio Mining Company, the company could now, with business prudence, declare a dividend to the stockholders dividing the sum of $100,000; and that these defendants, as directors of the Presidio Mining Company, are ready and willing to pay into this court, in cash and Liberty Bonds the sum of $100,000 and to stipulate the sum of $61,155.60, representing their equitable interests, as stockholders in the Presidio Mining Company in said fund of $100,000, may be held by this court as a bond to insure the payment of any money judgment which the complainants may recover, either for the benefit of the Presidio Mining Company, or for the benefit of themselves as and for costs and counsel fees in this suit."

Why was not this offer sufficient security for any decree that might be entered in the case?

There is incidentally another objection to defendants' opposition to the appointment of a receiver in the statement of the assets of the corporation. It is alleged by the complainants that these assets were subject to deductions, among others, that there must be a deduction of $50,000 and upwards for income taxes. If, as is here asserted by the complainants, the corporation was liable for at least $50,000 income taxes for the preceding year under the federal income tax law, then there must have been a net income of considerable proportion to call for such a tax. This item alone would seem to be sufficient to establish the fact that the Presidio Mining Company, when the appointment of a receiver was applied for, was a going concern of considerable efficiency engaged in profitable mining operations under the Noyes management.

As Wm. S. Noyes had been ready and willing at all times since he had become the owner of section 5 on May 26, 1913, to convey it to the Presidio Mining Company upon the payment of the purchase price, it is difficult to see what substantial or equitable matter remained for a decree in equity to operate upon. There is nothing in the evidence calling for a decree in accordance with the amended

prayer to the amended bill of complaint that a receiver be appointed to take charge of all the affairs and business of the company authorizing him to sell the entire property and assets of the corporation, wind up its affairs, including section 5, prohibit Wm. S. Noyes and the other defendants from in any way participating in the sale, either directly or indirectly, and from having anything further to do with said section 8 and section 5 and with the affairs of the corporation.

We find nothing which justifies any decree other than a decree for conveyance of section 5 by Noyes to the company upon payment of the purchase price in accordance with his offer. That Noyes in all his dealings with the Presidio Mining Company acted in good faith is abundantly established by the evidence. On January 23, 1913, Mr. Noyes wrote to Mrs. Willis, who was then the holder of 36,000 shares of the Presidio Mining Company's stock:

"I have borrowed the money and got control of section 5—to add to the Presidio later on."

In the report of Noyes dated October 6, 1913, to the board of directors of the corporation, he said:

"Early in 1913 section 5 adjoining the Presidio mine was on the market for sale. The company being unable to buy it, it having exhausted its credit on the new installation before mentioned (cyanide plant and tramway), it was purchased by the writer and an agreement made wherein this company will work it on terms of the division of the net and perhaps will purchase the same later on. Late developments in section 5 indicate that it will be a source of large revenue."

A copy of this report was sent to all the stockholders of the company, including the plaintiffs.

In Noyes' report to the stockholders dated February 20, 1915, he inclosed the report of the superintendent, Mr. Gleim, for the period of 16 months ending December 31, 1914. This is the report Capt. Overton saw at the mine in April, 1915, and a copy of which he found at his home on his return to Washington, and which he says he then studied more closely. In this report, Noyes says, among other things:

"As mentioned in the report for 1913, I bought section 5 to work in conjunction with the Presidio. It was offered to the Presidio Mining Company which was unable to buy it, and after that the contract to work it on shares was made."

In Noyes' report to the stockholders dated February 28, 1916, he makes a detailed statement of the operation of the company and says:

"The contract to buy ore from section 5 has been a source of good profit to the company, though, of course, much less than it might have been, but for the poor conditions in the silver market. * * * But for this last mentioned decline in the market price for silver the company would long ago have acquired section 5 as was originally contemplated in 1913. Provided the market remains at its present level, we should be prosperous during the coming years."

The testimony of Noyes concerning the purchase of section 5 by him, but for the Presidio Mining Company, if the company wanted it and would pay for it, was open, clear, and distinct and corresponds

to his reports to the stockholders of the corporation. It will be found stated fully in the previous opinion of this court in 261 Fed. at pages 962, 964.

The case thus presented to the court by the plaintiffs and on the trial by letters, documents, exhibits, transcripts, and books of accounts, the report of a public accountant constituted evidence of a character peculiarly subject to examination and review by the court of appeals when the.case was brought to this court to be tried de novo, and our conclusions are reached after thorough and repeated examination of this evidence.

The appellees in their petition for a rehearing complain that this court did not mention Noyes' "confession" that during the entire period over' which the analysis of his character extended, he was receiving a monthly graft from a contractor doing one of the largest businesses with the company. The appellees say this "confession" was forced out of Noyes while under examination. The matter referred to was a transaction with Benton Bowers relating to the hauling of freight for and the selling of wood to the company. The evidence was not forced out of the witness and was in no sense a "confession," but was related by him voluntarily in the course of his examination by his own counsel and referred to a transaction which he had stated took place some time in the 90's or the early part of 1900. The transaction grew out of the necessity of having reliable transportation and a better quality of wood for the company. To enable Bowers to start this business, Noyes took an interest with him in the enterprise. The company was benefited by the arrangement. It secured reliable transportation and a better quality of wood for the same price as before. This occurred about 15 years before the question here in controversy arose. Benton Bowers, whose testimony was uncontradicted, testified as follows:

"We made no profit the first year. We did not make any profit until we commenced to deliver this wood and began to get back the money that he had advanced on these teams and the wood that we had cut and hauled out there to dry. I delivered that wood to the company at Shafter for $6, the same price the former company had been putting it in for, but it was a very different quality of wood—a very much superior quality of wood. I hauled straight wood, split wood that grew on the bottoms, and the other wood had been scrub wood off the mountains that was very crooked. It took four or five years before we got our money back—probably a little longer before we got all our capital back. After that, what we made out of it varied according to the prices we had to pay for the stuff. We got about $100 a month out of it for two or three years, both Mr. Noyes and myself together; sometimes it would run a little more and sometimes a little less; we got $100 for each of us. After that, it commenced to dwindle down. The profit that we made out of this business was made on wagons and supplies and things we furnished the men—the equipment. There was very little profit, if there was any, made out of the wood hauled—in producing the wood. We had to buy the stumpage. The conditions when Mr. Noyes drew out of that business were that it dropped down. When they went to use oil, that cut off the use of wood, and it did not take but a few teams. After that, the equipment dwindled down to very little. It was just the provisions, feed, and stuff that was furnished. When I say that they commenced to use oil, I mean by that to use oil for fuel instead of wood, at the mill. Wood was not plentiful around that country on the Texas side; there was very little. You had to

go up into the mountains, and the wood was cut off of the mountains and carried down on burros, thrown down, because you could not get up after it in the wagon. All of the timber that grew on the mountains here was scrubby. The change from using wood to oil took place in 1902 or 1903, I do not remember which, but some time about that time."

As the company was not prejudiced in any way and as the transaction is in no way connected with the present controversy, we did not consider it necessary to discuss it in our opinion.

After a careful re-examination of the evidence and a review of the argument on this rehearing, we find no reason for changing our original opinion in any material matter. In our former opinion we found the charges of conspiracy and fraud directed against Wm. S. Noyes and his codefendants unsupported by the evidence. This conclusion left the case as Judge Dooling found it upon the insufficiency of the original complaint with respect to the controlling question in the case, namely:

1. The evidence did not show that section 5 was bought with the money of the Presidio Mining Company.

2. The evidence did not show that the lease of November 19, 1913, was not profitable to the Presidio Mining Company.

3. The evidence did not show that Wm. S. Noyes was not the owner of section 5.

4. The evidence did not show any legal or equitable interest of the Presidio Mining Company in section 5.

5. The evidence did not show that the salaries paid the officers of the company were illegal or fraudulent, but on the contrary the evidence did show that such salaries were reasonable and just.

[5] Upon this evidence we did not direct the dismissal of the action as we might have done and as the defendants insist we should have done and should do now; but in view of all the circumstances, in the interest of what appeared to be the substantial rights of the parties and an equitable and economical disposition of the controversy, we treated the action as in the nature of a notice for the specific performance of an agreement to sell section 5 with a notice to terminate the lease of November 19, 1913, in accordance with its terms and an accounting that would provide for the conveyance by Wm. S. Noyes of section 5 to the Presidio Mining Company upon the payment to him of the purchase price, together with interest and all taxes and assessments paid by him during the ownership of the property in accordance with his repeated offer. This was a remedy within the sound discretion of the court and we deemed it appropriate to the circumstances of the case and authorized by the direction contained in section 269 of the Judicial Code (Comp. St. § 1246) of the United States, as amended by the act of February 26, 1919 (40 Stat. 1181 [Comp. St. Ann. Supp. 1919, § 1246]).

Our former judgment (261 Fed. 933–965) is reaffirmed and will be re-entered as follows:

"That part of the interlocutory decree providing 'that in and by said final decree the said William S. Noyes shall be ordered and directed within 30 days from the date thereof to transfer said section 5 to said Presidio Mining

Company by proper deed free and clear of all liens and incumbrances' will stand affirmed.

"That part of the decree relating to the payment of the purchase price of the property to William S. Noyes, providing, 'that said William S. Noyes be credited with the purchase price of section 5, together with interest thereon at the rate of 7 per cent. per annum from January 25, 1913, and also any sums which may be found to have been paid by said William S. Noyes for the use and benefit of said Presidio Mining Company, together with interest on said sums at the rate of 7 per cent. per annum from the date of payments,' will stand affirmed.

"That part of the decree will run against the Presidio Mining Company and its officers and directors, and will be as of the date of February 16, 1918; the amount due thereon to be ascertained by a reference to the accountants, Klink, Bean & Co.

"The final decree will also provide for the payment to William S. Noyes of the amount due him under the lease of November 19, 1913, from January 25, 1913, to February 16, 1918; the amount to be ascertained by a reference to the accountants, Klink, Bean & Co., with direction to extend and complete their schedules as they appear in the record and are there numbered 4, 5, 6, 7, 8, and 9, so as to include in like manner, but in a condensed form, all royalties due and payable to William S. Noyes for the years 1916, 1917, and down to February 16, 1918.

"In this computation Wm. S. Noyes will be charged with $3,500, which we find was in effect paid to him on September 6, 1913, and was applied by his direction to make good a further shortage in the accounts of L. Osborn. This amount is included in the statement made by Noyes that up to December 31, 1915, he had received $63,336.20. To the amount thus found due William S. Noyes under the lease of November 19, 1913, will be added the amount found due him on the purchase price of section 5, and for the full sum so found due him the final decree will run against the Presidio Mining Company, its officers, and directors.

"The interlocutory decree in all other respects not herein mentioned will be reversed and set aside, the interlocutory injunction dissolved, and the receiver discharged. The plaintiffs and defendants will each pay their own costs in this court."

GILBERT, Circuit Judge (dissenting). There is no question of res judicata in the case. In denying the motion for the appointment of a receiver and for an injunction on the original bill, Judge Dooling denied the motions with leave to renew the same upon filing an amended bill, and said:

"The motion to dismiss will be granted unless plaintiffs within 20 days file an amended bill stating a ground for the granting of equitable relief."

No order was made dismissing the bill, and no judgment was entered. Under permission of the court an amended bill was filed. Whether that bill was in substance the same as the original bill, as the appellants contend, is unimportant. It was the bill which the appellants answered and on which, together with a supplemental bill and the answers thereto, the case went to trial, and those two bills are the only bills before this court for consideration on the present appeal, except that the original bill, having been introduced in evidence, may be referred to for whatever it may contain in the way of admissions on the part of the appellees. The general rule of law which prevails in all courts is succinctly stated in Post v. Pearson, 108 U. S. 418, 2 Sup. Ct. 799, 27 L. Ed. 774, where it was held that an order sustaining a defendant's demurrer and giving the plaintiff

leave to amend does not preclude the plaintiff from renewing or the court from entertaining the same question of law at the subsequent trial on an amended declaration. No case is found which sustains the contrary view. The decisions in C. S. M. Co. v. V. & G. H. Sawmill Co., 1 Sawy. 685, Fed. Cas. No. 2990, and Plattner Implement Co. v. International Harvester Co., 133 Fed. 376, 66 C. C. A. 438, hold only that it would lead to unseemly conflicts if the ruling of one judge upon a question of law should be disregarded or be open to review by another judge in the same cause. There was no question of res judicata in those cases. It was solely a question of the propriety of judicial conduct. There was no denial of the power of one judge to overrule the prior decision of another judge of co-ordinate power in the same court and in the same cause, but it was held that to do so would be unseemly, not that it would be reversible error. The rulings in those cases might have been presented to Judge Van Fleet as a reason why he should decline to rule otherwise than had his predecessor if identical questions had been presented to both, but it has no place here in an appellate court in aid of the proposition that Judge Dooling's decision constituted res judicata. If Judge Dooling had entered a final judgment dismissing the suit, which he did not, the judgment would of course have been res judicata as to a second or a concurrent suit on the same grounds as were disclosed in the original complaint, but not if the judgment was for the omission of an essential averment which was supplied in the second suit. Gould v. Evansville & C. R. Co., 91 U. S. 526, 23 L. Ed. 416; Wiggins Ferry Co. v. O. & M. Ry. Co., 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055; and see the decision of this court in Miller v. Margerie, 170 Fed. 710, 96 C. C. A. 30. There is no res judicata in any case in which the court, in sustaining a demurrer or a motion to dismiss, grants leave to amend, and an amended complaint is filed and further proceedings and final judgment are had thereon. None of the cases cited for the appellants holds otherwise. In point of fact the amended bill contained a number of new averments of fact tending to establish a constructive trust in W. S. Noyes, such as the allegation that the expenses incurred by him in connection with acquiring control of section 5 were paid by the Presidio Mining Company, as well as the fact that the surveying and testing of the ores from section 5 during the existence of the options which Noyes obtained were performed by the officers and employés of the Presidio Mining Company at the expense of that company.

The court below reached the following conclusions as to the facts: (1) That the original acquisition of control of the corporation by the appellants was through a fraudulent manipulation of the Osborn stock; (2) that the Osborn shortage came to the knowledge of Noyes as early as December, 1912, and that he took advantage of it, to secure from Osborn his stock without any real compensation whatsoever, and that this was accomplished by the use of funds which belonged to the company, but in a manner that never resulted in the shortage being made good to the company, that the circumstances which culminated in control of the corporation in the hands of W. S. Noyes indicated

that it was not a just and fair transaction; (3) that W. S. Noyes acquired section 5 by virtue of his control of the company and its board of directors; (4) that it was in substance an acquisition of that property by funds of the corporation; (5) that Noyes and his superintendent Gleim were the only persons connected with the company fully cognizant of the character of section 5 and its value; (6) that Noyes knew at the time that he had potential control of his corporation; (7) that he could have procured the means or funds from the corporation with which to pay for the land, and that the course he pursued brought about that result, and that the bonus resolution was with that object in view, first, to secure the means by which to manipulate the control of the Osborn stock, and, second, the bonus resolution brought about a situation which enabled him to secure the funds of the company, and that the subsequent lease of section 5 to the corporation enabled him to procure the means with which to pay the consideration which was paid for section 5; (8) that the entire transaction after Noyes got control by getting a board of directors which was absolutely under his domination shows a persistent manipulation of its affairs, in fraud of the minority stockholders, and which redounded solely to the interest of said Noyes.

The following facts in my opinion fully justify the decision of the court below: W. S. Noyes, during the 30 years of his connection with the company, sustained a highly fiduciary relation to it. Until the year 1913 he had the general management of the mining operations. On January 29, 1913, he was made director, vice president, and general manager. His duties, as he testified, remained about the same that they had been before. He said that the mining property "had been for years under my charge with full discretion down there." In his answer to the amended bill he stated that since 1882 he had been in the full charge of all the mining operations conducted by the corporation, keeping in constant touch with all the mining, milling, and reduction work carried on, and acting as consulting engineer for the corporation as well as general manager of all its mining operations. At the time when he acquired section 5 and entered into the contracts of lease, and obtained the bonus resolution, he had complete control of the directorate of the company. The lease of section 5 to the mining company was made on January 25, 1913. Noyes made the terms of it, and he was in effect both the lessor and the lessee. It reserved to him a royalty of 50 cents per ton of the ore to be taken from section 5. Three weeks thereafter he procured the bonus resolution of the corporation, which provided for payment to him of $45,000, of which $11,000 was to be paid forthwith. By the terms of the resolution the bonus was given solely for services and money expended by Noyes in obtaining the lease. But he testified that in fact it was given to secure him the rental which had been agreed upon, which instead of 50 cents per ton of ore was in fact to be one-half the net profits of the ore. A resolution of the corporation passed in November following adopts that construction of the bonus resolution.

In his answer to the amended complaint Noyes alleged that he was forced to buy section 5 without knowledge of or opportunity for investigating its value, and that it would have been a hazardous venture for the mining company in the absence of knowledge of the ores contained in that section to undertake to buy the property. This was wholly untrue. Noyes had had opportunity to know the value of the property. He had examined it and he had made numerous assays of its ores, and the mining company had borne the expense of the examination. He had discovered, as he subsequently admitted, that ore of the nèt value of $50,000 was then in sight. He knew that within a few months in milling in the cyanide plant then to be installed in the mining company's property the ore already developed in section 5, there would be realized, net, double the amount of the purchase price of the section. Before he even took options on the property he had made arrangements to borrow on his personal credit the money to purchase the same. If he made any suggestions to the officers or stockholders of the company that they buy section 5 for the company, there is no pretense that he ever disclosed to them the knowledge which he had acquired of the property or its value. Knowledge of all those facts was withheld. Again, it is not credible that upon the credit of the company the money could not have been obtained to buy the property. About that time Noyes had obtained on the company's credit money to install a cyanide plant at a cost of $44,000 and to make other improvements aggregating $70,000, and immediately after the execution of the lease, he had the bonus resolution passed requiring the company to pay him $45,000, a sum almost double the purchase price of section 5, and under the bonus resolution and the lease, he received within 33 days $11,000, and within ten months he received from the mining company a total of $26,503.60, a sum more than sufficient to pay the purchase price, and more than sufficient to meet his obligations for the money which he had borrowed to make the purchase of section 5. By December 31, 1915, he had received $63,000 cash, and the mining company still owed him, so he testified, $49,000. In addition to this he was paid his yearly salary of $5,400. Further facts may be adverted to as confirmatory of the view that Noyes was conducting the company's business for his individual benefit rather than for the benefit of the corporation, such as the confessed fact that he received from Bowers, who had a contract for hauling and furnishing supplies for the mining company, monthly payments out of Bowers' profits amounting to $3,195 between 1908 and 1914, for which payments Noyes admitted that there was no specific consideration "other than Mr. Bowers' friendship for me."

Noyes incurred no risk to himself in buying section 5. Before he became obligated to pay the purchase money he had ascertained that the value of the property was far in excess of the purchase price. When in November, 1913, he had received from the company sums sufficient to reimburse him for all of his outlay with interest thereon, he was in duty bound to transfer the section to the company. Instead of discharging that obligation, he took advantage of the fiduciary relation

which he sustained to the company to obtain for himself profits which in equity belonged to his corporation, and for which he should be held to account to the appellees, and he retained title to property which in equity should be impressed with a constructive trust for their benefit. Koehler v. Black River Falls Iron Co., 2 Black, 715, 17 L. Ed. 339; Wardell v. Railroad Co., 103 U. S. 651, 26 L. Ed. 509; Seacoast Railroad Co. v. Wood, 65 N. J. Eq. 530, 56 Atl. 337; H. C. Girard Co. v. Lamoureux, 227 Mass. 277, 116 N. E. 572; Meeker v. Winthrop Iron Co. (C. C.) 17 Fed. 48; Morgan v. King, 27 Colo. 539, 63 Pac. 416; Ross v. Quinnesec Iron Co., 227 Fed. 337, 142 C. C. A. 33; Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176; Iroquois Iron Co. v. Kruse, 241 Fed. 433, 154 C. C. A. 265.